May it please the Court, my name is Richard Strome. I'm here on behalf of Appellant Betty Lewis. I represented Betty Lewis below. Your Honor, what I thought I'd do is to try to spend the bulk of my time trying to outline the key events that occurred from this transaction that you've seen on the tape. The restraint chair was done at approximately 12.03. This was 18 minutes after he had already been in custody. The restraint chair was ordered by my client because she felt that she could not control him because he was beating his head on the floor. He was a danger to himself. Can I interrupt you at that point? Yes, sir. Are you, it seemed to me at least that you were disputing a fact there where you say beating his head because the plaintiffs in their brief say he wasn't beating his head. He may have moved around and hit his head. But it seemed to me, and maybe I'm wrong, it's your term, beating. And you're not able to dispute the facts. So how does that characterization come in? Betty Lewis characterized it as hitting the floor, striking the floor, not obeying her order to stop banging his head. Well, that's Betty Lewis's story. But you're compelled to take the plaintiff's story. If plaintiff was in his brief saying that it was simply a voluntary motion on his part where he was moving his head, my response would be that regardless of whether it was voluntary or involuntary, the nurse perceived But the word beating implies intentional hitting one's head. Yes, sir. You should not use it. I apologize. All right. With respect to the reason why she put him in the restraint chair was because she felt that he was a danger to himself and to others. That's clear. Put him in the chair at 12.03. She then leaves. She's not present for the chairing. She doesn't return to the chairing until 12.09. And at 12.09, when she returns to see him, his affect, the way he is presenting symptoms, how he looks medically to her, is that he is fine. He's stable. In fact, he talks to her. He says something to the effect, you're the reason why I'm here. And from that, she is believing that at 12.09, there is no acute event. There is no problem with him medically. The first indication that we have that something might be wrong occurs at 12.10, and that's when his head goes, quote, back. And by the way, all of the information that's contained on this comes from the testimony of Jacqueline Moore, who is the opposing nursing expert. So these times are those times which we've specified based on the opposing expert. So at 12.10, which is simply six, seven minutes later, there is this head that goes back. She was only there at 12.09. So she sees the head go back and doesn't know what's wrong with him. As a clinician, she's trying to figure out what's wrong with him. So she begins to do a series of clinical tests. And the White v. Colorado case that I referred the court to indicated that assessment is a necessary part of medical treatment. The assessment that she begins doing involves things like taking the pulse, checking for breath sounds, calling for a stethoscope, trying to check and see if this individual is responsive. The key point to keep in mind is that between the time when this first objective sign that his head is going back at 12.10 and the time when she calls for 911 or CPR, that four-minute period, she doesn't know what's wrong with him. That's a long time, you know, in a medical situation, though. Yes, sir. It is a long time. On the other hand, she doesn't have anything physically to tip her off what's wrong with him. For example, Your Honor, this wouldn't be a case like he's got a burst artery and he's pulsing blood. And so she would know that there's a problem. Remember, this is in a jail setting. So when she is talking to him and then the next thing that happens, the only symptom is he goes limp, she has a couple of things to think about. Number one, is he faking? No, I understand. I take your point. I think the critical issue is why is this summary judgment material? Isn't there – I mean, it's hard to say how there's not a genuine issue of fact in her response that would entitle them to get to a jury. I think – I credit your argument. And – but why don't you think there's – they have an update to a jury on this? Because I think it's a medical judgment call. I think the basis of the qualified immunity for a health practitioner as opposed for a security practitioner, a security person, is very important. And I think you have to give that latitude to health care practitioners. And Farmer v. Brennan makes it very clear that if you're talking about a risk that she should have perceived, and I take it that your Honor's argument would be four minutes is a long time, she should have perceived the possibility that he was having an acute event. No, I'm actually thinking about another case, which is similar to this in the sense that we had a few months ago, in which a person was in fact in – suffering a heart attack. They misdiagnosed it under similar circumstances as indigestion. And we said there were – heard a similar argument. We said there are enough genuine issues of fact to go to a jury on that, even though one could legitimately argue that that's a medical judgment call. Failure of assessment is malpractice, but not deliberate indifference. The reason why I think it's qualified immunity and not to be defeated by a summary judgment is because in Farmer v. Brennan, one of the things a plaintiff has to prove is the fact that she was not only aware of these possible problems, but she drew an inference and then disregarded it. In this case, my point is she didn't draw the inference. Now, that may be malpractice. And she will still have to answer for that when we go back to Phoenix, because there's still a tort claim that's on the table with respect to the wrongful death. Maybe they'll be able to establish that because of the delay here, because of her misapprehension of what his symptoms were, that's wrongful death and she's entitled to tort damages. She's still the extra family still gets their day in court. But with respect to what the long lasting importance of this case is, the medical practitioner here at the time when she's confronted only with one very ambiguous symptom, which is simply silence in a jail setting. Well, that's not that's sort of we get hammered by the Supreme Court for divide and conquering on reasonable search and seizure. And somewhat that's what you're doing here. You're breaking it down into these finite, discrete moments, looking at the overall picture. I mean, we have the Lawley case, which says, you know, your inmate comes in or arrestee comes in with diabetes that sets the stage for anything that follows, because diabetes carries with it various known medical risks. So here, this fellow is brought in and he comes in with a condition. It's not just all of a sudden some normal, healthy guy suddenly goes into some kind of unconscious or other kind of behavior. There's a totality here. And that's isn't that the argument that the jury has to sort through and say, in the totality of the circumstances, is your breaking it down and focusing on these discrete moments enough? I agree with you. I apologize. I agree with the totality of the argument concept, but I don't agree with the idea that she has basically required to be a clairvoyant or to understand. No, I don't think we're trying to hold her to clairvoyance. I don't think that's a fair response. I think the question is whether, in terms of what she knew, what objectively she should have known, you take the whole picture and is it appropriate, A, for her to have chaired him in the first place? Maybe so, maybe not. How he was chaired? You said she left. Well, I mean, if this fellow is vulnerable and frail, is it within her appropriate medical judgment to just leave it to these jailers to go ahead and get him strapped down and whatever? Getting back to the totality of the circumstances, the reason why she called 911 is when four things coalesced. They all happened at once, and it was at 1214. There was no pulse. The breath sounds went from 12 to 4 to nothing. Well, but that assumes that the positional asphyxia wasn't an intervening cause. It could have been avoided by not having him in the chair in the first place or could have changed how he was positioned in the chair so that this episode may not have been triggered. That's their theory. Their theory is that what brought on the circumstance was her failure to properly supervise, get him the right kind of treatment, and as a result, he winds up with what they say is death by positional asphyxia. That's why I went into law. I can't speak medicine. Are you on the purposes of this appeal, do you concede that that was one of the causes of his death? Positional asphyxiation? Yes. No, sir. Aren't you disputing a fact then? Well, let's put it this way. Well, you know, if you're disputing a fact, we don't have jurisdiction. We'll just send it right back. Yes, sir. So are you disputing it? We're not disputing a fact. So you are conceding then? Conceding that that's their theory. No. Are you conceding it as a fact for this appeal that one of the causes of death was positional asphyxia? It may have been. It may have been. Are you conceding it, sir? Conceded. Yes, that's the question. Are you disputing it? No. No, why? We would not dispute it. You're not disputing it, are you? So you are conceding it. For purposes of the appeal. Thank you. Of course, you can dispute it vigorously if it goes that far. Of course you can. For this appeal, you're not. If we were to retain the jurisdiction. Your Honors, I'm out of time. I didn't reserve any rebuttal. I apologize. Apropos of Judge Fisher's comment about the stage, Lewis set the stage and recognized the stage that she was playing on with Charles Agster. It wasn't Charles Agster that came in and said, Nurse Lewis, I'm a 9-18. I'm sick. I need help. She recognized, and she was told when he came in, he was non-combative. He did not resist arrest. He was not violent. And he was on his way to an emergency room in the middle of the night, on his way to the ER to get help. She was told all that. She was told all that. She knew that. This man came in on his way with his mom and his dad to the ER. He was obviously sick. And she recognized that. I think the problem you have is that your level of proof for a constitutional violation is so much greater than it is for ordinary malpractice negligence. And we do have a great deference that we give to medical judgments, in the constitutional sense, not in personal. Well, let's take both of them one at a time. And there are really two that we've asked the Court to look at. One, the deliberate indifference of putting Charles in the chair in the first place. Number two, the deliberate indifference of not reacting to Charles' extreme life-threatening condition while in the chair. Once she recognized that he was pulseless and had no breath, it took over four minutes for chest compressions to begin. Is that just medical malpractice? What we have here in addition, Your Honor, is the video that shows absolute, utter non-urgency on her part to start chest compressions. If the Court has had a chance to view the video, she is fiddling with this IV. They're doing respiration, but they're not doing chest compressions on a man that they knew four minutes earlier at a minimum, four minutes earlier, had no pulse. Now, on that point, medical malpractice or deliberate indifference or something even worse, her notes done the next day, two separate notes, and they're in the record, the next day, say that she knew, she knew at seven minutes after the hour that he was pulseless. Excuse me. Seven minutes after and chest compressions don't start until 18 minutes after, 11 and a half minutes later. So we do dispute the timeline here. This is, these, first of all, yes, we do dispute this. Nurse Lewis talking to Mr. Agger at 1209.42, that didn't happen. And there's nothing on that video and there's nothing in the record that that happened then. At 1209, she did start taking vital signs at 1209, but she wasn't talking to him. In her interview with the police after the death and in her notes the day after she made, she said he was nonresponsive. She didn't say anything about ever talking to him. And earlier in the deposition, she said she didn't ever talk with him and he didn't talk with her. She did come up with a story later in the deposition that he said something to the effect you're the reason. The bottom line, though, is you dispute that. Yes, I'm sorry. What else do you dispute in the timeline? We are, Your Honor. But the timeline, if you just take either of these things, I think clearly fly past the analysis that this Court did in Gibson with respect to the restraint chair. Well, let me just say, can I understand, you said that there are two events. One is putting him in the chair and the other is a slow or delayed reaction. But where's the evidence in this record that the decision to put him in a restraint chair, properly placed and properly positioned in the chair, is somehow an improper medical judgment at all? Well, we have, I think, a fair amount on that. And it comes from the county's own policies that they have not disputed that Nurse Lewis knew and was comfortable with. The policies themselves say, first of all, no inmate crosses that threshold unless that inmate has had a proper medical screening. None was done on him. Not a thing. Until after he was already on the way to the hospital, they created a record, but it was time stamped 59 minutes after the hour. I'm sorry, I marked on mine, but this is Exhibit 20 of ER 337. She is supposed to do a medical screening herself, then another medical screening. Nothing, except that she says he's unconscious. Now, that goes to your question, Judge Fisher. Unconscious or semi-conscious detainees are never supposed to be put in the chair. County's own policies. She says in that same exhibit, the inmate was able to contract for his safety, which means he was not suicidal. Yet she creates a story later on that she put him in the chair because he was suicidal. So let me finish that point, Your Honor, because it's an important one. So she violates the medical screening before he's put in. She violates that same policy. Mr. Agster exhibited three of the three general conditions in the policy that are defined as severe medical conditions that required him to be referred to a contract facility. Required it. All three of the medical conditions that are described, he had, she knew it. She didn't send him to the medical facility. She knew from another county option that she, another county policy procedure, she had four options for putting him somewhere else, all safer options. She didn't do it. That is policy 1-39.0. She knew from that same policy 1-39.0 that any inmate who appeared to be suicidal or to exhibit bizarre behavior had to be referred, had to be referred to the medical site staff. She didn't do that. Policy 00-64.1, .0, that she knew she could not order a restraint of Charles without a supervisor and a doctor approving it. She knew that, or is held to know it. They didn't dispute that she knew it. 00-64.0. Now, in addition, she created a record that she admitted in her deposition was incorrect. And it's exhibit number 27 in the record, ER-337, where she said Dr. Hoffert approved this chairing at five minutes after the hour. She admitted he did not. Nurse Nichols admitted he didn't, Nichols admitted that he did not, and so did Dr. Hoffert. So she violated at least three county policies as well as common sense, which of course is a 1983 touchstone. If there's no case on all fours or another good case, is it common sense? And does this go beyond medical malpractice? We submit that it goes far beyond that, Your Honor. Now, I don't have, I've got a couple minutes left, and I don't want to leave short the second part of the deliberate indifference analysis with Nurse Lewis. Is it just medical malpractice? Is it just deliberate indifference for a nurse to know that she has a patient who is absolutely pulseless and breathless and wait four minutes to start some sort of treatment? Let's take the best time available to her as four minutes. According to her own notes, it was 11 and a half minutes. Four minutes before she has anyone start chest compressions. Forget that she didn't do it. Let's say she had to get that IV bag and the only access to that IV was a key that she had. Have somebody else start chest compressions on a man that's pulseless? You wait four minutes? By best analysis, 11 and a half at worst. Even another inmate, and this is in the record, when they brought Charles up in that chair, looked at him from a window three feet away and slashed her throat. Even an inmate in an adjacent cell knew this man was in dire physical condition. That's in the record. Yet Nurse Lewis does nothing but poke his eyes, pinch his nose, put ammonia strips under him because she thinks he's faking. What evidence is there that this man was faking? He was only semi-conscious at best. He was a 9-18. Nothing showed that this man was faking. Medical malpractice, deliberate indifference, or something even worse than that? She had warnings from three DOs and multiple warnings from those three DOs that this man was in dire medical condition. She did nothing but poke his eyes, pinch his nose, and put ammonia under his nose. I'm sorry, she also did what she called a painful stimuli by doing the sternal rub. This is obviously more than a course of care case, but again, it's a question of fact. Is this Judge Fischer medical malpractice or something more? Isn't that for the jury to decide under these facts? They didn't contest these facts. Any questions? No, I think we have your argument in hand. Mr. Strome, we'll give you a minute for rebuttal if you'd like one.  Good morning, we'd like to hear from you. Thank you, Judge Thomas. Let me focus on his argument that chest compressions were not started within four minutes. He's mixing apples and oranges. What happened was at 12-14, she immediately recognized that there was a need for intervention. She had 911 called, and then, pointing from the record, and this is on page 185, that's of the bait stamp record, this is Betty Lewis's affidavit, it's ER tab B. It says, I did not wait 15 seconds to start an airway after immediately asking for emergency to be called when I first determined that Charles Agster was suffering from an acute event. That was at 12-14. I ran to get IV supplies from the place where they're kept, which is outside the frame of the camera. I left only to get the IV supplies so that when Phoenix Fire arrived, she'd have an access line for rescue drugs. I did not fail to perform chest compressions. In fact, you can see in the video that she was starting the IV while Fran McNichols was doing the chest compressions. Their expert conceded that CPR involves a number of preliminary steps, including clearing an airway and doing the necessary preparations that she was doing. The key is that a health care provider has the duty to act, to assert that kind of training and experience that is necessary to help an inmate. And once the acts are done, provided they're done with the correct mental state, and it's not criminal recklessness, everything else is a judgment call. Thank you. Thank you. I know our time has been limited this morning. I want to thank everyone for their economy of presentations. This is en banc week for us, so we have some other obligations. But we appreciate you coming here today. We appreciate the arguments. And the case is just heard to be submitted.
judges: Noonan, Thomas, Fisher